IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA A. PATSAKIS, et al., | ) |
| Plaintiffs, | ) Civil Action No. 03-1851 |
| v. | ) |
| | ) Hon. Thomas M. Hardiman |
| GREEK ORTHODOX ARCHDIOCESE OF AMERICA, et al., | ) |
| Defendants. | ) |

## OPINION

### I. Introduction

Plaintiffs Patricia A. Patsakis (Patsakis) and Angela Sklavos (Sklavos) sued the Greek Orthodox Archdiocese of America (Archdiocese) and the Greek Orthodox Diocese of Pittsburgh (Pittsburgh Diocese or Diocese) for discrimination in violation Title VII of the Civil Rights Act of 1964 alleging wrongful termination in retaliation for complaining about sexual discrimination in the workplace. Defendants filed a motion for summary judgment, arguing that Plaintiffs cannot prove a *prima facie* case of retaliation and, even if they could, Plaintiffs cannot prove that the legitimate nondiscriminatory reasons Defendants have articulated to justify Plaintiffs' terminations were pretextual. For the reasons that follow, the Court will deny the motion.

### II. Factual Background

The Archdiocese is a branch of the Greek Orthodox Church, with its headquarters in New York, New York. The head of the Archdiocese is Archbishop Demetrios, who is assisted by a Chancellor and Assistant Chancellor. Father Michael Kontogiorgis (Fr. Michael) has served as the Assistant Chancellor from 1998 until the present. The Archdiocese consists of eight

dioceses, or metropolises, and the Pittsburgh Diocese covers most of Pennsylvania, West Virginia, and Ohio. Each diocese is run by a bishop, or metropolitan, who in the Pittsburgh Diocese is Bishop Maximos Aghiorgousis (the Metropolitan). The Metropolitan has ultimate authority in the Diocese, and his staff acts on his behalf. He is responsible for administering to the spiritual and secular needs of the members of the Diocese. The Metropolitan is assisted in these endeavors by various staff members, including the Chancellor and the Registrar. In the Greek Orthodox Church, only priests serve as chancellors; any lay person holding the position is called Administrative Assistant or Vicar.

Plaintiff Patsakis began working for the Diocese on December 1, 2001 as Registrar. She was also hired as the Mt. Tabor Coordinator, which meant she was responsible for fundraising, bookkeeping, and the production of official correspondence. Plaintiff Sklavos began working for the Diocese as Executive Secretary in August 2001. In that capacity, she performed various clerical duties and assisted with the publication of the Diocesan newspaper. On March 1, 2002, Father John Panagiotu (Fr. John), the Chancellor of the Diocese, was relocated to South Carolina and Patsakis was made Temporary Administrative Vicar, in addition to her other positions. Father Ryan Gzikowski (Fr. Ryan) became Assistant to the Metropolitan on May 1, 2002, after having worked in the Diocese for several summers. As Assistant to the Metropolitan, Fr. Ryan assumed the duties of Chancellor, including those assigned to the Vicar.

Not long after Fr. Ryan began serving as Assistant to the Metropolitan, disagreements arose between Fr. Ryan and Plaintiffs. It is clear from the record that there was already a larger conflict ongoing within the Diocese, and that the allegedly discriminatory behavior occurred in the context of this existing struggle. The record concerning the dispute that existed in the

Diocese is voluminous, and the salient facts for purposes of the pending motion relate to the complaints of discrimination made by Patsakis and Sklavos and their subsequent termination.

Patsakis and Sklavos both believed that Fr. Ryan treated them differently because they were women. The factual support they offer to buttress this contention falls into two categories: gender neutral behavior they interpreted as discriminatory based on the target and gender specific comments they believe are discriminatory based on their content. With respect to gender neutral conduct, Plaintiffs allege that Fr. Ryan was intimidating towards them, and would frequently slam doors and break pencils. He was also dismissive by ignoring them when they spoke or passed him in the hallway. At the same time, however, Patsakis acknowledged that Fr. Ryan is friendly to other women in the office, and Sklavos testified that he routinely ignores priests, who are all male.

Plaintiffs emphasize two incidents of gender specific comments in support of their complaints of discrimination. First, Patsakis overheard Fr. Ryan telling someone in the Diocese kitchen that he "had to work with two damn women." Second, on August 20, 2002, Patsakis received an email from office volunteer Cindy Balouris (Balouris), which purports to relay the content of a conversation that Balouris had with Fr. Ryan several days earlier. In the email, Balouris quotes Fr. Ryan saying that he "was the only one that was having sex," that "everyone in the Diocese needs to get laid," and that Vasie-Leigh Androitis (Vasie-Leigh), another female working at the Diocese, was "another one that needed a good screw." Balouris also claims in her email that Fr. Ryan said "he was going to show everyone there that he is the only one with Balls." In addition, the email quotes Fr. Ryan saying that "none of the priests want to work with women and it's not up to our Diocese to straighten Greek men out on that fact. He said I am

3

sorry that Greek men are the way they are, but us women have to accept it." When confronted by the Metropolitan about the foregoing email, Fr. Ryan denied making the comments attributed to him.

Based on what they perceived to be sexual discrimination by Fr. Ryan, Patsakis and Sklavos complained repeatedly to various members of the Archdiocese, including the Metropolitan. In addition, Patsakis complained to Linda Petersen (Petersen), the Human Resources Manager for the Archdiocese, and Jerry Dimitriou (Dimitriou), the Executive Director of Administration.

Less than two months after Patsakis received the email from Balouris, on October 4, 2002, Fr. Ryan went into Patsakis' office looking for the Metropolitan's signature stamp. While doing so, Fr. Ryan opened a drawer and found a tape recorder and several cassette tapes. He listened to part of the tapes and found that they were conversations among, *inter alia*, Patsakis, Sklavos, Fr. Michael, and the Metropolitan. Fr. Ryan reported his discovery to Fr. Michael, who in turn told the Metropolitan. Based on the voices on the tapes and the meetings and conversations they included, Fr. Ryan became convinced that Sklavos and Patsakis were responsible for the recordings and that they were motivated by the ongoing struggle within the Diocese. Patsakis claims that she taped a meeting in accordance with her responsibilities, and that the recorder was obvious to everyone in the room at the time.

On October 7, 2002, the Metropolitan prepared two letters stating that Patsakis and Sklavos were being terminated because of the restructuring of staff positions and instructed Fr. Ryan to terminate them. On October 8, 2002, when Patsakis arrived at work, Fr. Ryan informed her that she was terminated and ordered her to collect her belongings and depart. Patsakis then

telephoned Sklavos and informed her that they had both been terminated. Sklavos arrived at the Diocese, collected her things, and left as well. When asked for a reason why they were being fired, both Plaintiffs were told by Fr. Ryan to contact the Executive Director of Administration, Jerry Dimitriou.

Patsakis and Sklavos asked Dimitriou why they had been fired, but never received an answer from him. Thereafter, Plaintiffs received the termination letters drafted by the Metropolitan on October 7, which indicate that their terminations were because of a staff restructuring. Consistent with the Metropolitan's letter, in the employment questionnaire submitted to the Archdiocese after Sklavos filed for unemployment benefits, Human Resources Manager Petersen cited office restructuring as the reason for Sklavos' termination. Peterson testified that she could not remember being aware of the tape recording at the time she completed the questionnaire. In a letter to the Equal Employment Opportunity Commission (EEOC) written August 28, 2003, Defendants stated that Patsakis was fired because she was disloyal and insubordinate to the Metropolitan, and listed surreptitious tape-recording as an example of her disloyalty. In their letter to the EEOC concerning Sklavos' termination, Defendants wrote that she was fired because of a staff restructuring intended to improve the functioning of the office and remove disloyal employees.

### III.  Standard of Review

Summary judgment is required on an issue or a claim when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250-52 (1986); *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). An issue is "material" only if the factual dispute "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

"Summary judgment procedure is properly regarded not as a disfavorable procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation marks omitted). The parties have a duty to present evidence; neither statements of counsel in briefs nor speculative or conclusory allegations satisfy this duty. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). After the moving party has filed a properly supported motion, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party must make a showing sufficient to establish the existence of each element essential to her case on which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

## IV. Analysis

Defendants argue that Plaintiffs have failed to state a *prima facie* case of retaliation and, alternatively, have failed to rebut the legitimate non-discriminatory reasons for termination offered by Defendants.

### A. *Prima Facie* Case

To prove a Title VII retaliation claim, a plaintiff "must show that (1) [she] was engaged in protected activity; (2) [she] was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge."

*Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

With respect to the first criterion - engaging in protected activity - "protesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct. Thus, a plaintiff need not prove the merits of the underlying discrimination complaint, but only that [s]he was acting under a good faith, reasonable belief that a violation existed." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (internal citations omitted).

In *Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001), the Supreme Court found that a Title VII plaintiff had not engaged in protected activity because "no reasonable person could have believed that the single incident recounted above violated Title VII's standard." *Id.* at 271. In an unpublished opinion, the Court of Appeals for the Third Circuit cited the *Clark County* decision, recognizing this objective reasonableness requirement. "A plaintiff's belief may be mistaken, but employer retaliation is prohibited if the allegations of discrimination have an objectively reasonable basis in fact." *Fogleman v. Greater Hazleton Health Alliance*, 122 Fed.Appx. 581, 583 (3d Cir. 2004) *citing Clark County Sch. Dist. v. Breeden,* 532 U.S. 268 (2001) *and Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307 (11th Cir. 2002). Similarly, the Court of Appeals for the Seventh Circuit has held that "only a groundless claim resting on facts that no reasonable person possibly could have construed as a case of discrimination could not constitute a statutorily protected activity. And a mistake as to the merits of a complaint does not cost an employee the protection of Title VII." *Firestine v. Parkview Health System, Inc.*, 388 F.3d 229, 234 (7th Cir. 2004) (internal citations omitted).

In the instant case, there is ample evidence that Patsakis and Sklavos subjectively believed that they were being discriminated against. Thus, the question presented here is whether

their subjective belief could be found objectively reasonable by a jury.

Initially, the Court agrees with Defendants that merely slamming doors or breaking pencils could not form the basis of an objectively reasonable belief that Fr. Ryan was discriminating against Plaintiffs. But the record reveals more. For example, Patsakis claims to have overheard Fr. Ryan complaining that he has to work with two "damn women," and both Patsakis and Sklavos read the email from Balouris in which Fr. Ryan reportedly stated that "everyone in the Diocese needs to get laid," that "he is the only one with balls," and that another female employee "needed a good screw." Defendants attempt to minimize the impact of the Balouris email by claiming that the phrase "everyone in the Diocese" referred to every practicing member of the Diocese, rather than the employees of the Diocese. This contention is belied, however, by the previous statement that Fr. Ryan was "the only one that was having sex." Considering the context of the email and viewing the inferences in favor of the Plaintiffs, as the Court must at this stage of the case, it is clear that Fr. Ryan was talking about the employees of the Diocese and not the congregation at large. In addition, Fr. Ryan not only insisted that "none of the priests want to work with women" but also lamented that "it's not up to our Diocese to straighten Greek Men out" and the "women have to accept it."

Although the comments attributed to Fr. Ryan in the aforementioned email were neither directed at nor made in the presence of Plaintiffs, they relate directly to sex, gender, and plainly could be deemed offensive to a reasonable listener. The Court finds that the statement overheard by Patsakis, in conjunction with the content of the email, could be sufficient to support a reasonable belief, even if erroneous, that Fr. Ryan had engaged in discrimination prohibited by Title VII. Thus, Plaintiffs satisfy the first element of a *prima facie* case of retaliation.

The record also demonstrates that Plaintiffs have satisfied the second and third elements, namely that they were discharged after engaging in protected activity and some causal link exists between the activity and the discharge. The discharges in this case clearly occurred after the protected activity, and thus the second requirement is satisfied. As to the casual connection, the Third Circuit stated in *Woodson* that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." *Woodson*, 109 F. 3d at 920. Here, Plaintiffs were terminated less than a month after their last complaints, thus satisfying the third requirement for a *prima facie* case.

**B.     Pretext**

Once a *prima facie* case is established, the burden shifts to the defendant. "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994) (internal citations omitted). Here, Defendants insist that Patsakis and Sklavos were terminated because they were discovered clandestinely tape-recording fellow employees and superiors, including the Metropolitan. There can be no doubt that the surreptitious tape recording of the Metropolitan and others constitutes a legitimate, nondiscriminatory reason for Plaintiffs' discharge.

"Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual . . . ." *Id.* at 763. In *Fuentes*, the Court of Appeals explained:

> This basic framework under Title VII illustrates that, to defeat summary
> judgment when the defendant answers the plaintiff's prima facie case with

> legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* at 764.

In *Smith v. Borough of Wilkinsburg*, 147 F.3d 272 (3d Cir. 1998), the Court of Appeals held that an employer's shifting justifications for termination can constitute sufficient evidence of pretext. In *Smith*, the district court did not instruct the jury regarding their ability to use the defendant's changing reasons as sufficient proof of pretext and the Third Circuit reversed, based on this failure:

> [The Borough] had advised the EEOC and the Pennsylvania Commission on Human Relations that it didn't renew Smith's employment contract because he failed to file a formal application, in contrast to its explanation at trial which emphasized Smith's poor job performance. While this variation in articulated reasons did not compel the jury to disbelieve the Borough, the inconsistency was sufficient for a reasonable jury to view it as evidence of pretext leading to an inference of discrimination if the jury had been adequately charged.

*Id.* at 281.

In the instant case, Patsakis and Sklavos were not given any reason for their termination on October 8, 2002. In both the letters Plaintiffs received from the Metropolitan and in the correspondence sent to the Unemployment Commission by Human Resources Manager Petersen, the proffered justification for Plaintiffs' terminations was office restructuring. The nondiscriminatory reason given by Defendants in this case, the surreptitious tape recording, does not surface until Defendants' letter to the EEOC. Reviewing the record and drawing all inferences in favor of Plaintiffs, as the Court must at this stage, the vehemence with which the Defendants now insist that the tape recording was the sole motivation for firing Patsakis and

Sklavos is inconsistent with their failure, in the intervening months, to cite that reason. Accordingly, the Court finds, pursuant to *Fuentes* and *Smith*, that a jury could, but need not, conclude that Defendants' proffered nondiscriminatory reason is pretextual.

### C. Pittsburgh Diocese as an Employer under Title VII

Defendants also argue that the Pittsburgh Diocese is not an employer within the meaning of Title VII. Citing testimony from Dimitriou and others, Defendants insist that the Plaintiffs were employees of the Archdiocese, and in fact all employees working in the Pittsburgh Diocese were hired and paid by the Archdiocese. Plaintiffs contest this, and assert that the two Defendants are a single employer. Because material facts in are dispute concerning the status of the Pittsburgh Diocese as an employer, the Court will reserve judgment on this issue.[1]

### IV. Conclusion

In sum, the Court finds that there are sufficient material facts in dispute regarding the perceived discriminatory treatment complained of by Plaintiffs and the justifications for their termination, to preclude summary judgment in this case.

An appropriate Order follows.

_____
Thomas M. Hardiman
United States District Judge

April 21, 2006

---

[1] Defendants also argue that Plaintiffs' damages are minimal. The issue is not appropriately decided at the summary judgment stage, and thus the Court will not address it.

11